JONES, Plaintiff in error, v. STATE, Defendant in error.

*No. State 14. Submitted under sec. (Rule) 251.54 March 6, 1974.—Decided April 2, 1974.*

(Also reported in 216 N. W. 2d 224.)

98

The cause was submitted for the plaintiff in error on the brief of *Patrick J. Devitt,* Legal Aid Society of Milwaukee, and for the defendant in error on the brief of *Robert W. Warren,* attorney general, and *Steven B. Wickland,* assistant attorney general.

HALLOWS, C. J.   The writ of error to review the judgment was improvidently issued by the clerk of this court as over a year elapsed from the date of the judgment of conviction; consequently, the writ of error to review the judgment is dismissed.

The writ of error to review the order denying the motion for a new trial raises two questions of law.  While it was pointed out in *State v. Simmons* (1973), 57 Wis. 2d 285, 289, 203 N. W. 2d 887, and *State v. Wollmer* (1970), 46 Wis. 2d 334, 335, 336, 174 N. W. 2d 491, that the test to be applied in reviewing a trial court's order denying a new trial is whether there has been an abuse of discretion, this test is not applicable where a question of law is presented, as the applicable test is whether the court was in error. *State v. Mabra* (1974), 61 Wis. 2d 613, 213 N. W. 2d 545.

The two questions raised on this review are: (1) Whether the defendant had a right to counsel at an informal confrontation in the lobby of the district attorney's office prior to his being charged with a crime at which the victim-witness identified him as the armed robber; and (2) whether such informal confrontation was unduly suggestive and tainted the in-court identification so that neither identification should have been admitted in evidence at the trial.

The facts on these questions are somewhat in dispute. At approximately 10:30 in the evening of December 25, 1969, Timothy Ellis, a part-time taxicab driver for Checker Cab Company dropped off a woman passenger at 222 East Brown Street in Milwaukee; she told Ellis upon arrival to wait as she had to go into the house to get some money to pay him. Shortly thereafter, a male Negro emerged from the building, got in the cab through the rear door on the driver's side, sat on the left-hand side of the rear seat behind Ellis, and told Ellis he would pay the lady's fare but he should first take him to 23d and Lloyd. Ellis turned on the dome light in the cab and glanced at the passenger in the rearview mirror as he wrote the time and destination on his trip sheet. The rear-seat passenger was leaning forward and was approximately two feet from Ellis. Ellis then proceeded to drive where the passenger ordered him. During the drive, the passenger put a snub-nosed revolver to the back of Ellis' head and ordered him to continue driving and finally to stop at an address on North Hubbard Street, which was about two blocks from the address where the passenger had entered the cab. At this point the passenger told Ellis his gun was loaded and he wanted all of Ellis' money. The passenger ordered Ellis to look at the gun, and Ellis not only glanced at the gun but also at the passenger once again. After receiving the money, the passenger left the cab. A few minutes later Ellis called the police from a corner telephone and gave a description of the robber. He described the robber as a Negro male, twenty to twenty-four years old, slight to medium build, five feet eight inches to five feet ten inches tall, 140 to 150 pounds, wearing a three quarter length dark fur-type coat, rather shaggy looking like matted seal fur, and a small brim-type dark hat. Ellis described the coat as having large buttons and large baggy sleeves. He did not notice any identifying facial marks or scars.

When the detectives arrived, they, together with Ellis, proceeded to the East Brown Street address where Ellis had dropped off the woman and picked up the passenger who had robbed him. The detectives entered the building where they found Jones and a young woman who fit the description given by Ellis. Jones also matched the description given by Ellis and the coat was found in the bedroom. Jones was arrested and taken to the Safety Building.

Sometime later, a lineup was conducted in the Safety Building in which Jones appeared along with three or four other black males. Ellis sat some 15 to 20 feet from the lineup but was unable to identify any of the lineup participants as the man who robbed him because he did not have his glasses with him and could not distinguish one from another. Ellis was told to return to the detective bureau around 8:30 or 9, later in the morning. When he arrived that morning, he was not referred to the bureau of identification but was taken by a detective to the anteroom corridor outside the district attorney's office. There he sat with the detective. Shortly thereafter, Jones appeared in the corridor accompanied by another detective and two officers on his way to the district attorney's office. Ellis, upon seeing Jones, voluntarily identified Jones to the detective sitting with him as the man who had robbed him the preceding evening; later in the district attorney's office, Ellis repeated the identification and Jones was then charged with armed robbery.

While Ellis was sitting in the district attorney's office, there was present another cab driver, Jose A. Pierce, who had been similarly robbed the preceding evening and who had positively identified Jones at a showup conducted earlier that morning in the detective assembly as the man who had robbed him. There is a dispute in the record whether at this point Ellis talked to Pierce. At the *Wade* hearing, Ellis said he did not; Jones testi-

fied he saw Pierce and Ellis talking together. This issue was for the fact finder to resolve, which he did against Jones.

At the time of the lineup in the early morning when Ellis could not identify anyone, Jones was without an attorney and also at the time of the meeting outside the district attorney's office. Although Jones had contacted an attorney, he was not notified of this informal confrontation. There is nothing in the record to indicate, if it is material, that the police staged this informal confrontation outside the district attorney's office. The parties all treat this as an informal confrontation or one out-of-a-crowd identification, and this court will so consider it.

The issues of the lack of an attorney and the suggestiveness of the out-of-court identification were the subject of a motion to suppress prior to trial, which was denied. At the trial, the prosecution put in evidence both of the identification of Jones by Ellis outside the district attorney's office and an in-court identification and the parties were subjected to cross-examination. The issues were again raised on the motion for a new trial, which was supported by a *Wade* hearing.

### *Right to counsel.*

The first issue is whether Jones should have been afforded counsel at the pretrial, informal confrontation outside the district attorney's office. In *United States v. Wade, supra,* the United States Supreme Court held that an accused was entitled to counsel at a "critical stage" of the prosecution and that a post-indictment lineup was such a critical stage. Counsel was required to insure the preservation of the accused's basic right to a fair trial as affected by his right to cross-examine the witnesses against him and to have the effective assistance

of counsel at his trial. The presence of counsel at lineups, the court thought, would minimize the likelihood of an overly suggestive confrontation and would enable counsel to make an informed challenge at the trial either to the admissibility or the credibility of identification testimony. This view was grounded on the sixth amendment guarantee to an accused of the assistance of counsel and upon the fourteenth amendment guarantee of due process of law. The court recognized a corollary problem in a conviction resting upon a courtroom identification which in fact might be the fruit of a suspect pretrial identification where the accused without benefit of counsel was unable to effectively expose the circumstances surrounding the pretrial identification.

In *Gilbert v. California* (1967), 388 U. S. 263, 87 Sup. Ct. 1951, 18 L. Ed. 2d 1178, the supreme court held that the absence of counsel at pretrial lineups was a ground per se for excluding testimony of the lineup identification at trial. The per se exclusionary rule was not limited specifically to post-indictment identifications either in *Wade* or in *Gilbert* and was subsequently stated without such limitation in *Foster v. California* (1969), 394 U. S. 440, 442, 89 Sup. Ct. 1127, 1128, 22 L. Ed. 2d 402. Of course, the prosecution had the right at trial and the opportunity of proving by clear and convincing evidence that an in-court identification had a source independent of a pretrial out-of-court identification. *United States v. Wade, supra,* citing: *Murphy v. Waterfront Commission* (1964), 378 U. S. 52, 79, note 18, 84 Sup. Ct. 1594, 12 L. Ed. 2d 678; *Nardone v. United States* (1939), 308 U. S. 338, 60 Sup. Ct. 266, 84 L. Ed. 307. The proper test to be applied was adopted from *Wong Sun v. United States* (1963), 371 U. S. 471, 83 Sup. Ct. 407, 9 L. Ed. 2d 441:

" ' "[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made

has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." ' " *United States v. Wade, supra,* page 241.

After these decisions, this court decided *Wright v. State* (1970), 46 Wis. 2d 75, 175 N. W. 2d 646, and *Hayes v. State* (1970), 46 Wis. 2d 93, 175 N. W. 2d 625. In *Wright,* this court stated that the substantial equivalent of the federal post-indictment stage began after the issuance of the warrant or complaint. In *Hayes* this court took the view that the critical stage at which an accused was entitled to counsel was that point in the proceeding when it had "moved from a purely investigatory to an accusatorial stage." Under this view of the Wisconsin and Federal Constitution's guarantee, the defendant would be entitled to counsel prior to being formally charged with a crime by a warrant or complaint. However, in *Kirby v. Illinois* (1972), 406 U. S. 682, 92 Sup. Ct. 1877, 32 L. Ed. 2d 411, the United States Supreme Court severely limited the application of the *Wade-Gilbert* rule under the federal constitution and held that an accused had no right to counsel at a lineup conducted prior to the commencement against the accused of an adversary, judicial, criminal proceeding. *Kirby* then held that the criminal proceeding commenced for federal constitutional purposes when the state government had committed itself to prosecute "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." After *Kirby,* this court reshaped the Wisconsin law to reflect the *Kirby* limitation by withdrawing the language in *Hayes* which had established the mark between the investigatory and the accusatorial stage and recognized the mark as that time when the warrant is issued or a complaint filed. *State v. Taylor* (1973), 60 Wis. 2d 506, 521, 522, 210 N. W. 2d 873; *State v. Russell* (1973), 60 Wis. 2d 712, 720, 211 N. W. 2d 637; *see also:*

*Jones v. State* (1973), 59 Wis. 2d 184, 207 N. W. 2d 890; *Laster v. State* (1973), 60 Wis. 2d 525, 535, 211 N. W. 2d 13. As a consequence of these cases, Wisconsin affords no greater protection to an accused for an attorney at a lineup under the Wisconsin Constitution than that which is afforded by *Kirby* under the federal constitution.

Jones argues that even under *Kirby* he was entitled to counsel at the informal confrontation outside the district attorney's office. He had obtained counsel the night before; the police officers knew who counsel was; and there was no urgency for the confrontation and he was brought to the district attorney's office for the purpose of issuing a complaint against him; and under these facts, there was a beginning of the adversary proceeding against him. This would have been a good argument under *Hayes;* it has no merit under *Kirby* and the subsequent cases in Wisconsin. If the line of demarcation is to be definite, the complaint or the warrant must be issued. Anything prior to that time falls on the wrong side of the line. Consequently, no constitutional right of Jones was violated because of absence of his counsel at the informal confrontation outside the district attorney's office.

### Informal confrontation.

Jones claims the informal confrontation was unduly suggestive and tainted the in-court identification. In *Stovall v. Denno* (1967), 388 U. S. 293, 87 Sup. Ct. 1967, 18 L. Ed. 2d 1199, the United States Supreme Court announced that, independent of any *Wade-Gilbert* claim, an accused might gain relief if he could establish that he had been subjected to a confrontation "so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." Wheth-

er a due-process violation occurred at a confrontation was to be determined by "the totality of the circumstances surrounding it." This test is independent of whether or not counsel for the accused is present. In *Simmons v. United States* (1968), 390 U. S. 377, 88 Sup. Ct. 967, 19 L. Ed. 2d 1247, the court ruled that an in-court identification, following an out-of-court identification, would be inadmissible if the out-of-court identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." In the very recent case of *Neil v. Biggers* (1972), 409 U. S. 188, 93 Sup. Ct. 375, 34 L. Ed. 2d 401, the court also adopted this standard as governing the admissibility of testimony concerning the *out-of-court* identification.

Not every instance of suggestiveness in a confrontation procedure violates due process. *See Neil v. Biggers* (1972), 409 U. S. 188, 93 Sup. Ct. 375, 34 L. Ed. 2d 401. Law enforcement authorities are required to make reasonable efforts under the circumstances to conduct a fair presentation for identification so as to avoid the likelihood of misidentification which is a primary evil to be avoided. The police should avoid suggesting identification.

Jones argues that the informal confrontation in the district attorney's outer lobby was unnecessarily suggestive because: (1) It was a one-to-one confrontation such as condemned in *Stovall v. Denno, supra,* because the accused did not mingle in the room with the other people but was escorted through the room to the district attorney's office in handcuffs by a detective; (2) the district attorney's office's lobby or outer office was suggestive of guilt and a more accusatorial setting than a formal lineup in a police department; (3) there was no compelling reason for this type of confrontation because a formal confrontation was available and in fact had been used earlier in the morning when the other cab

driver identified him; (4) there may have been other evidence indicating his guilt, such as the presence of the first cab driver in the room and the fact that he was a suspect; (5) the police were sure of his guilt; (6) the emotional state of the witness, Ellis, may have been such as to preclude objective identification; and (7) the limited observation of Jones by Ellis.

Obviously, objections four, five and six are not based on the record but are merely speculation of what might have happened. This is not proof of the suggestiveness of the lineup. We do not consider this informal confrontation as a one-to-one confrontation, nor are the facts clear that Ellis saw the handcuffs upon Jones. Ellis testified he did not; but even if he did, that fact alone would not be sufficient suggestiveness.

The identification of Jones by Ellis in the district attorney's outer office or lobby was not prompted by the police; Ellis was not told why he was taken to the district attorney's office; he did not expect a confrontation. So far as the record shows, Ellis, upon seeing Jones, spontaneously identified Jones. This was a natural reaction under the circumstances.

Jones' third argument that there was no compelling reason for this confrontation does not necessarily make the confrontation suggestive. There is no evidence to show that the prior formal lineup had any influence on Ellis' unprompted identification; although, in the first lineup Ellis could not identify Jones because he did not have his glasses—he did have his glasses on in the district attorney's outer office.

In respect to the reliability of Ellis' identification itself, Ellis had an opportunity to observe Jones twice, once when he put on the dome light prior to the robbery and again when Jones told him to look at the revolver. Jones was only two to three feet away at both times. In both instances, Ellis' degree of attention was high. A description of Jones given to the police immediately after

the robbery was accurate. It is true Ellis failed to notice a scar on Jones. But under the circumstances, this was at night and in the taxicab, such failure is not of great weight. An identifying witness need not notice every mark, feature or piece of clothing on a person. It is sufficient if what is observed as identifying marks actually identify the particular person. In this respect the overcoat was described in detail and found a few minutes later in the bedroom of the apartment where Jones was arrested. Besides, Ellis did not waver in his identification; it was positive; it was made without any prior viewing of photographs and was made less than twelve hours after the robbery. We think these facts fit the test laid down in *Neil v. Biggers* (1972), 409 U. S. 188, 199, 93 Sup. Ct. 375, 34 L. Ed. 2d 401.

"As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."

*See also United States ex rel. Phipps v. Follette* (2d Cir. 1970), 428 Fed. 2d 912; Sobel, *Eye-Witness Identification* (1972), pp. 64, 69, sec. 37. The *Biggers* pronouncement has been accepted in *Pate v. State* (1973), 61 Wis. 2d 25, 30, and *State v. Russell* (1973), 60 Wis. 2d 712, 721, 211 N. W. 2d 637.

We think the trial court committed no error in allowing the out-of-court identification in evidence and it follows that the in-court identification was likewise properly admitted. At the *Wade* hearing the trial court found the in-court identification "was an independent recollection of his own based on his observations as he viewed the defendant at the time of the trial." This determination the trial court is competent to make. It

has been held that even an appellate court, given an adequate record, is entitled to resolve the issue of whether an in-court identification of an accused is based on the witness' observation other than that made at an unconstitutional viewing. *See United States ex rel. Harris v. Illinois* (7th Cir. 1972), 457 Fed. 2d 191, certiorari denied, 409 U. S. 860, 93 Sup. Ct. 147, 34 L. Ed. 2d 106.

*By the Court.*—Writ of error to review the judgment is dismissed; the order denying a new trial is affirmed.