Sᴛᴀᴛᴇ of Wisconsin, Plaintiff-Appellant,†

v.

Brian Hɪʙʟ, Defendant-Respondent.

Court of Appeals

*No. 2004AP2936–CR. Submitted on briefs June 8, 2005.
—Decided September 28, 2005.*

2005 WI App 228

(Also reported in 706 N.W.2d 134.)

† Petition to review granted 12-14-05.

806

On behalf of the plaintiff-appellant, the cause was submitted on the brief of *Ted S. Szczupakiewicz*, assistant district attorney for Waukesha County, authorized and supervised by the attorney general.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Joel H. Rosenthal* of *Luck & Rosenthal, S.C.*, Milwaukee.

Before Snyder, P.J., Brown and Anderson, JJ.

¶ 1. SNYDER, P.J. The State appeals from an order suppressing the pretrial and in-court identification of Brian Hibl by Alan R. Stuller, a witness for the prosecution. The State contends that the circuit court erred in holding that the eyewitness identification of Hibl was impermissibly suggestive and unreliable. Although we employ a different analysis, we affirm the order of the circuit court.

## FACTS

¶ 2. On June 25, 2002, at 2:53 p.m., Detective Lieutenant Steven Kukowski of the City of Muskego Police Department was driving southbound on Racine Avenue in the City of Muskego. Kukowski noticed a red pickup truck and a white van speeding northbound. He watched the two vehicles jockey for position as they traveled toward a portion of the road that narrows from two northbound lanes to one. He estimated that the two vehicles were going fifty miles per hour where the speed limit was thirty-five miles per hour. After the vehicles passed him, Kukowski continued to watch them in his rearview mirror and he observed the van pull ahead of the pickup truck. The pickup truck then pulled into the southbound lane, apparently attempting to pass the van. Then, although Kukowski did not see the actual collision, he suddenly noticed dust and vehicle parts in the air and saw that the pickup truck was spinning. The white van was no longer in sight.

¶ 3. Stuller witnessed the accident. Detective Paul Geiszler took a brief statement from Stuller at the scene and asked him to go to the police station to give a more complete statement. Stuller complied. At that time, Stuller identified the van driver as a white male; Stuller was unable to describe the driver in any other way. Stuller was not asked to make an identification of the van driver from any photo array or lineup procedure.

¶ 4. Two days later, Scott Anderson of Anderson Flooring, Inc. informed the police that one of his employees, Brian Hibl, reported witnessing the accident. Detective James Kaebisch interviewed Hibl and took a statement from him. Hibl told Kaebisch that he had been driving a white cargo van northbound on Racine Avenue on June 25 at approximately the same time the accident occurred. Kaebisch reported that at one point Hibl admitted that he did see the accident and may have been a contributing factor. Hibl told Kaebisch that he had accelerated at a high rate of speed going north on Racine Avenue and had increased his speed as a red pickup truck attempted to pass him.

¶ 5. The State charged Hibl with one count of causing great bodily harm to another by reckless driving contrary to Wis. Stat. § 346.62(4) (2003–04),[1] and two counts of causing bodily harm by reckless driving contrary to § 346.62(3).

¶ 6. Prior to Hibl's November 18, 2003 trial date, Stuller received a subpoena to appear as a witness. On the day of trial, prior to commencement of the trial, Stuller identified Hibl in the hallway outside of the courtroom. He subsequently identified Hibl in the courtroom during the trial. Hibl moved for a mistrial, the State did not object, and the circuit court declared a mistrial.

¶ 7. Hibl then filed a motion to suppress the pretrial and in-court identifications made by Stuller. The circuit court held evidentiary hearings on June 4 and August 9, 2004, and granted Hibl's suppression motion. The State appeals.

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

## DISCUSSION

¶ 8. We review a motion to suppress using a two-step analysis. *See State v. Dubose*, 2005 WI 126, 16, 285 Wis. 2d 143, 699 N.W.2d 582. First, we review the circuit court's findings of fact. "In reviewing an order suppressing evidence, appellate courts will uphold findings of evidentiary or historical fact unless they are clearly erroneous." *Id.* (citations omitted). Next, we independently review the application of relevant constitutional principles to those facts. *Id.* This review presents a question of law for our de novo review, but we benefit from the analysis of the circuit court. *Id.*

¶ 9. We begin with the circuit court's rationale for granting Hibl's suppression motion. The court used the analytical framework presented in *State v. Wolverton*, 193 Wis. 2d 234, 533 N.W.2d 167 (1995), *abrogated by Dubose*, which requires a two-step analysis. First, the defendant must demonstrate that the pretrial identification occurred in an impermissibly suggestive manner. *Id.* at 264. If the defendant meets this burden, the State must then show that the identification was reliable despite the manner in which it occurred. *Id.*[2]

¶ 10. Since the circuit court's order, our supreme court has revisited the *Wolverton* test. In *Dubose*, our supreme court provided a substantial history of the

[2] We note that the circuit court suppressed both the pretrial and in-court identification evidence offered by the State. The State offered no independent basis for Stuller's in-court identification of Hibl; therefore, if the pretrial identification was tainted, the in-court identification was properly suppressed. *See State v. Mosley*, 102 Wis. 2d 636, 652, 307 N.W.2d 200 (1981) ("where a subsequent *in*-court identification is also challenged as tainted by the prior one, the state must show the in-court identification derives from an independent basis").

810

evolution of the relevant law and articulated the new legal standard to be applied in matters of pretrial witness identification. *See Dubose*, 699 N.W.2d 582, 17–27. It tracked, through several key cases, the United States Supreme Court's concern about the reliability of out-of-court identification evidence. The *Dubose* court explained:

> After the Supreme Court's decisions in [*Neil v. Biggers*, 409 U.S. 188 (1972)] and [*Manson v. Brathwaite*, 432 U.S. 98 (1977)], the test for showups evolved from an inquiry into unnecessary suggestiveness to an inquiry of impermissible suggestiveness, while forgiving impermissible suggestiveness if the identification could be said to be reliable.

*Dubose*, 699 N.W.2d 582, 31. Departing from *Biggers* and *Brathwaite*, and turning to *Stovall v. Denno*, 388 U.S. 293 (1967), as a guide, our supreme court stated:

> [W]e now adopt a different test in Wisconsin regarding the admissibility of showup identifications. We conclude that evidence obtained from an out-of-court showup is inherently suggestive and will not be admissible unless, based on the totality of the circumstances, the procedure was necessary. A showup will not be necessary, however, unless the police lacked probable cause to make an arrest or, as a result of other exigent circumstances, could not have conducted a lineup or photo array.

*Dubose*, 699 N.W.2d 582, ¶ 33 (footnote omitted). The supreme court further observed that "[s]tudies have now shown that . . . it is extremely difficult, if not impossible, for courts to distinguish between identifications that were reliable and identifications that were unreliable." *Id.*, ¶ 31. Accordingly, our supreme court withdrew "any language in *Wolverton* . . . and in cases cited therein, that might be interpreted as being based

811

on the Wisconsin Constitution. Those cases were based on the United States Constitution and focused more on the reliability of the identification than on the necessity for a showup." *Dubose*, 699 N.W.2d 582, ¶ 33 n.9.

¶ 11. The question of necessity will only arise in situations where police procedure is involved. Hibl insists that the courthouse hallway encounter was not merely random chance, but occurred under circumstances suggesting a planned confrontation. He asserts that "[t]he State knew or should have know[n] that Stuller would confront Hibl either in or around the courtroom." Had the police or prosecutor arranged a confrontation, *Dubose* would require us to affirm suppression of the identification evidence because the State has not demonstrated that such a procedure was necessary.[3]

¶ 12. The State argues that Stuller's courthouse encounter with Hibl was not the result of police or prosecutor action. The circuit court observed that "[t]here is no evidence that the police or District Attorney's office intentionally or unintentionally sug-

---

[3] "A showup will not be necessary . . . unless the police lacked probable cause to make an arrest or . . . could not have conducted a lineup or photo array." *State v. Dubose*, 2005 WI 126, 285 Wis. 2d 143, ¶ 33, 699 N.W.2d 582. Here, Hibl's own statement, together with the testimony of the police detectives, established probable cause for his arrest. Detective Kaebisch acknowledged that he never arranged a lineup or presented a photo array to determine whether Stuller could identify Hibl. By way of explanation, Kaebisch stated that Stuller's statement on the day of the accident gave no indication that Stuller had any ability to identify the driver of the white van. He stated that he looked at Stuller's statement and could not "see where any additional follow-up would be required."

gested the identification" of Hibl to Stuller. Based upon our review of the record, we accept the characterization of the encounter as free from police or prosecutor manipulation; in other words, it was an accidental confrontation. Consequently, the *Dubose* analysis regarding necessity is not applicable here.

■

¶ 13.  The remaining issue is whether, in the absence of police involvement, Stuller's identification of Hibl was properly suppressed. "Preliminary questions concerning . . . the admissibility of evidence shall be determined by the judge . . . ." Wis. Stat. § 901.04(1). A circuit court may, at its discretion, exclude evidence that is unfairly prejudicial. Wis. Stat. § 904.03. A circuit court's decision to admit or exclude evidence is a discretionary determination and will not be upset on appeal if it has "a reasonable basis" and was made "in accordance with accepted legal standards and in accordance with the facts of record." *State v. Pharr*, 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983) (citation omitted).

¶ 14.  Our supreme court has stated that proffered evidence must be "reliable enough to be probative." *State v. Walstad*, 119 Wis. 2d 483, 519, 351 N.W.2d 469 (1984) (citation omitted) (discussing the admissibility of expert opinion testimony). The supreme court turned to *Stovall* to demonstrate that the reliability of pretrial identifications is a question of admissibility, not credibility. *Dubose*, 699 N.W.2d 582, ¶ 17 n.3. "The overwhelming majority of American courts have always treated the evidence question not as one of admissibility but as one of credibility for the jury. Law enforcement authorities fairly relied on this virtually unanimous weight of authority, *now no longer valid,* in conducting

pretrial confrontations in the absence of counsel." *Stovall*, 388 U.S. at 299–300 (citation omitted; emphasis added).

¶ 15.   Courts have split on the question of whether suppression of witness identification evidence must be predicated on pretrial police conduct or if suppression is appropriate following other types of confrontations also. "The majority of courts require that an allegedly suggestive pretrial encounter be the result of either police or prosecution action to have an effect on the admissibility of in-court identification. These courts reason that without government involvement there is no violation of a defendant's constitutional due process rights." Lynn M. Talutis, Annotation, *Admissibility of In-Court Identification as Affected by Pretrial Encounter That Was Not Result of Action by Police, Prosecutors, and the Like,* 86 A.L.R.5th 463, § 2(a) (2001). "Other courts have, however, done away with the government action requirement. These courts typically reason that the deterrence of police conduct is not the basic purpose for excluding identification evidence. Rather, it is the likelihood of misidentification that violates a defendant's right to due process." *Id.*

¶ 16.   In *Dubose*, our supreme court aligned itself with the latter view, focusing on the likelihood of misidentification as the purpose for scrutinizing identification evidence. *Dubose*, 699 N.W.2d 582, ¶¶ 31–32.[4] Although *Dubose* addressed a police showup procedure, concerns about misidentification are not limited to those situations where the police arranged the confron-

---

[4] The supreme court cited several studies that document the problems associated with eyewitness identification evidence. *Dubose*, 699 N.W.2d 582, ¶ 29.

tation.[5] Principles of fairness dictate that identification evidence, even absent police involvement, must be scrutinized to determine whether suppression is required.[6] Here, the circuit court, citing *Wolverton*, considered the following factors in its rationale:

> [1] the opportunity of the witness to view the [accused] at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of his [or her] prior description of the criminal, [4] the level of certainty demonstrated at the confrontation, and [5] the time between the crime and the confrontation. (Alterations added.)

It proceeded with the following analysis:

---

[5] Referencing Samuel H. Gross, *Loss of Innocence: Eyewitness Identification and Proof of Guilt*, 16 J. LEGAL STUD. 395, 435 (1987), one commentator observed that

> [c]ourts have struggled with the question of whether to engage in exclusion when, by chance, an eyewitness encounters or sees the defendant. Professor Gross calls this a "spontaneous identification," and in his study he found "many reported misidentifications originated in this manner," but he was chagrined that persons writing about identification procedures had failed to acknowledge these are prone to errors, and had instead credited their reliability.

Margery Malkin Koosed, *The Proposed Innocence Protection Act Won't—Unless It Also Curbs Mistaken Eyewitness Identifications*, 63 OHIO ST. L.J. 263, 300 (2002).

[6] *See, e.g., Commonwealth v. Jones*, 666 N.E.2d 994, 1000–01 (Mass. 1996) (holding that although no governmental action contributed to the eyewitness identification and no due process rights were implicated, fairness required preclusion of the evidence); *People v. Walker*, 411 N.Y.S.2d 156, 159 (N.Y. County Ct. 1978) (holding that identification process conducted by nonpolice is subject to the same reliability and suggestiveness analyses as those traditionally imposed on procedures conducted by law enforcement personnel).

> Mr. Stuller first identified the defendant in the hallway outside of the courtroom with approximately nine other people in the hallway; this occurred on the day Mr. Stuller knew he would see the alleged defendant .... Just prior to identifying the defendant, Mr. Stuller spoke with the police officer assigned to the case and to the Assistant District Attorney assigned to the case .... There is no evidence that the police or District Attorney's office intentionally or unintentionally suggested the identification of the Defendant to Mr. Stuller; however, Mr. Stuller's juxtaposition in the courtroom hallway with the ADA, anticipating the alleged defendant in court in a few minutes, constitutes an identification that occurred in an impermissibly suggestive manner ....

> Mr. Stuller observed the driver/defendant on June 25, 2002, from 50 feet away while he was traveling 35 to 40 miles per hour, and the driver/defendant was traveling toward him in a white van at a high rate of speed .... On the day of the alleged offense, Mr. Stuller could not identify the driver's facial features, height, weight, or whether or not he wore glasses .... Mr. Stuller could only identify the driver as a "white male." Mr. Stuller's identification of Defendant occurred fifteen months after he witnessed the incident.

¶ 17. The circuit court's rationale is sound. Proffered evidence must be "reliable enough to be probative." *Walstad*, 119 Wis. 2d at 519 (citation omitted). Because the circuit court's order to suppress was made in accordance with accepted legal standards applied to the record facts, we will not disturb it. *See Pharr*, 115 Wis. 2d at 342.

## CONCLUSION

¶ 18. In *Dubose*, our supreme court turned the focus from the reliability of eyewitness identification to that of necessity in cases where police procedure is

involved. *Dubose*, 699 N.W.2d 582, ¶ 33. Here, where necessity is not an issue, the only consideration left for the circuit court is that of reliability. The circuit court's analysis demonstrates that Stuller's courthouse hallway identification of Hibl was not reliable; therefore, we affirm the court's order granting Hibl's motion to suppress the pretrial and in-court identification evidence.

*By the Court.*—Order affirmed.

¶ 19. BROWN, J. (*dissenting*). I disagree with the majority opinion for several reasons. First, I think it is essential that we establish what this case is about. This case regards the admissibility of an in-court identification following a pretrial encounter that did *not* result from government action. Thus, this case is different from those where the pretrial identification results from either a police or prosecution procedure such as a showup or a lineup or photo array. In shorthand, this is what the law calls an "accidental confrontation" or an unplanned or "spontaneous identification." *See generally* Lynn M. Talutis, Annotation, *Admissibility of In-Court Identification as Affected by Pretrial Encounter That Was Not Result of Action by Police, Prosecutors, and the Like*, 86 A.L.R.5th 463, § 14 (2001).

¶ 20. I understand the central position of the majority to be as follows: Other jurisdictions are divided about whether accidental identifications may be deemed inadmissible as a matter of law. Most courts adhere to the proposition that, without government involvement, there is no "suggestive procedure" used to obtain an identification; since there is no "procedure," there can be no state-sponsored manipulation which may affect the reliability of the identification. Thus, the law does not need the circuit court to act as "gatekeeper" on the question of manipulation prior to testimony before the trier of fact. Rather, it is for the trier of

fact, usually a jury, to assess the reliability of the spontaneous identification. A minority of courts have held that police conduct is not the basic purpose for excluding identification evidence. Rather, it is the likelihood of misidentification that violates a defendant's right to due process. Therefore, circuit courts possess gatekeeper responsibility to assess the reliability of the spontaneous identification, just as they have similar responsibility with regard to state-sponsored identification procedures. The majority concludes that, in *State v. Dubose*, 2005 WI 126, 285 Wis. 2d 143, 699 N.W.2d 582, our supreme court sided with the minority view.

¶ 21. I take issue with the majority's expansive interpretation of *Dubose*. I read *Dubose* as being limited to the context of pretrial showups, thus leaving prevailing rules intact with respect to other pretrial encounters. One of those prevailing rules, not even acknowledged by the majority, is the rule announced in *State v. Marshall*, 92 Wis. 2d 101, 117–18, 284 N.W.2d 592 (1979), *abrogated on other grounds by State v. Dean*, 103 Wis. 2d 228, 307 N.W.2d 628 (1981), *superceded in part by statute*, 1995 Wis. Act 440. In *Marshall*, our supreme court first reiterated the two-part test that existed at the time to determine admissibility of identification evidence under federal due process standards. First, the courts were to decide whether the confrontation procedure was unnecessarily suggestive. *Marshall*, 92 Wis. 2d at 117. If so, then they were to turn to whether the evidence was nonetheless reliable. *Id.* Only when the pretrial encounter was *both* unnecessarily suggestive and unreliable did the court exclude the evidence. *Id.*

¶ 22. Of particular importance to this case, the *Marshall* court then made clear that when the government has not deliberately employed a suggestive tech-

818

nique in order to obtain an identification, the two-part test is inapplicable. The court stated:

> Before this [two-part] analysis is applied . . . it must first be determined whether the confrontation was *deliberately contrived* by the police for purposes of obtaining an eyewitness identification of the defendant. [*Stovall v. Denno*, 388 U.S. 293 (1967)], [*Neil v. Biggers*, 409 U.S. 188 (1972)] and [*Manson v. Brathwaite*, 432 U.S. 98 (1977)] . . . all involved planned confrontations between a suspect and a supposed witness to a crime orchestrated by the police for the sole purpose of having the witness identify the suspect as the perpetrator of that crime . . . . Where the confrontation is not part of a police procedure directed toward obtaining additional evidence, but occurs as a result of mere chance or for some other reason not related to the identification of the defendant, the rule announced in those cases does not apply.

*Marshall*, 92 Wis. 2d at 117–18 (emphasis added). By definition, the State does not design or "deliberately contrive" accidental and unplanned confrontations. Thus, when faced with an allegedly suggestive encounter between an identification witness and the defendant, *Marshall* requires, as a condition precedent, that we first determine whether the relevant actor was a government actor. *Marshall* cited *Jones v. State*, 63 Wis. 2d 97, 216 N.W.2d 224 (1974), and *State v. Brown*, 50 Wis. 2d 565, 185 N.W.2d 323 (1971), *overruled on other grounds by State v. Walker*, 154 Wis. 2d 158, 453 N.W.2d 127 (1990), as examples of cases in which, although the circumstances were suggestive, the court nonetheless upheld the use of identification testimony derived from an unplanned confrontation.[1] *Marshall*, 92 Wis. 2d at 118.

---

[1] In *State v. Brown*, 50 Wis. 2d 565, 185 N.W.2d 323 (1971), *overruled on other grounds by State v. Walker*, 154 Wis. 2d 158, 453 N.W.2d 127 (1990), police had summoned the witness to the

¶ 23.   In my view, *Marshall* controls this case and indeed is factually similar. In that case, a neighbor gave a man directions to the victim's apartment and later heard an argument and gunshots coming from that direction. *Id*. at 108–09. The victim had been murdered. *Id*. Although the neighbor was unable to pick out the man to whom he gave directions from a photo array, the State still considered him to be an important witness and subpoenaed him to testify at Marshall's trial. *Id*. at 109, 118. Before the case was called, the neighbor observed the man to whom he had given directions. *Id*. at 119. The man was one of several seated in the courtroom and was sitting with a woman roughly three rows ahead of him. *Id*. Nobody had asked the neighbor to make an identification or suggested that the man was the defendant. *Id*. The neighbor summoned a detective into the courthouse hallway and told him that he recognized the man who had come to his door on the night of the murder. *Id*. The supreme court held that the use of the pretrial identification was admissible because it was unplanned and "was as much a surprise to the State as it was to the defendant." *Id*. at 118.

¶ 24.   Here too, the witness, Stuller, appeared pursuant to a subpoena to testify about matters other than the defendant's identity. The record does not reveal that

safety building to identify the defendant. *Id*. at 567. But before the police procedure could take place, the witness observed the defendant emerging from an elevator in the company of police officers. *Id*. at 567, 571. She identified the defendant immediately. *Id*. at 571. *Jones v. State*, 63 Wis. 2d 97, 216 N.W.2d 224 (1974), involved similar facts. Police were guiding the defendant to the district attorney's office when the victim, who was sitting in the corridor with a detective, observed the group. *Id*. at 101. The victim identified the defendant at that time. *Id*. In both cases, the court reasoned that these identifications were unplanned and spontaneous. *See id*. at 101–02; *Brown*, 50 Wis. 2d at 570.

anybody asked Stuller to identify Hibl. Nor is there any evidence that either the police or the assistant district attorney suggested that Hibl was the defendant. Rather, Stuller spontaneously identified Hibl among several people he saw in the hallway. Of particular importance, the trial court *found* that "there is no evidence that the police or District Attorney's office intentionally or unintentionally suggested the identification of the Defendant to Mr. Stuller." Indeed, the circumstances surrounding Stuller's identification were, if anything, probably less suggestive than the identification made in *Marshall* because there, the neighbor had seen Marshall's face in the photo array at some point before. Here, however, nothing suggests that Stuller had ever seen Hibl's face anywhere prior to the trial date—except perhaps in the white van he observed on the day of the accident.

¶ 25. We are bound by prior decisions of the supreme court unless or until those prior decisions are overruled by that court. *Cook v. Cook*, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997). The *Dubose* holding in no way overruled *Marshall*. In fact, *Marshall* is never mentioned in *Dubose*.

¶ 26. The *Dubose* opinion must be limited to "showups." Reading the opinion, it is quite evident that the *Dubose* majority disapproved of the widespread use of state-sponsored showups because of their "inherent unreliability" and set out to do something about it. Basically, the court held that the State may not use a showup as a procedure for obtaining an identification of a defendant if there are other, fairer means available to obtain the identification. In pertinent part, the *Dubose* majority wrote:

> [W]e now adopt a different test in Wisconsin regarding the admissibility of *showup* identifications. We conclude that evidence obtained from an out-of-court

821

*showup* is inherently suggestive and will not be admissible unless, based on the totality of the circumstances, the procedure was necessary. A showup will not be necessary, however, unless the police lacked probable cause to make an arrest or, as a result of other *exigent* circumstances, could not have conducted a *lineup* or photo array. *A lineup or photo array* is generally fairer than a *showup,* because it distributes the probability of identification among the number of persons arrayed, thus reducing the risk of a misidentification.

*Dubose,* 699 N.W.2d 582, ¶ 33 (emphases added; footnote omitted). Thus, with respect to showups, the court changed the test in state-sponsored identification procedures. The *Dubose* test is limited, by its very words, to showups.

¶ 27.  Indeed, the rationale *Dubose* gave for the newly announced rule in showup cases further supports the notion that it left *Marshall* intact. It stated that its strict necessity requirement helps "ensure that the police would *take precautions* when considering the use of a showup," a procedure the court deemed "inherently suggestive." *Dubose,* 699 N.W.2d 582, ¶¶ 32–33 (emphasis added). Both parts of that rationale are inapposite to unplanned encounters. First, it would be absurd to announce a categorical rule that accidental encounters are "inherently suggestive." Second, I do not see how the courts could reasonably expect the State to guard against unplanned encounters. Even if the courts were to impose such a duty with respect to only unplanned confrontations factually similar to the one here, I cannot envision any logical stopping point to the rule. I can think of no standard that logically distinguishes among encounters in a courtroom or courthouse hallway and those that occur outside the courthouse, in a donut shop across the street from the courthouse, or at an intersection just blocks away from the courthouse. I simply

cannot believe that *Dubose* provides authority for courts to prohibit identifications made based on fortuity.

¶ 28. Although the majority appears to acknowledge in one breath that the *Dubose* analysis does not apply, *see* majority op. ¶ 12, in the next it relies on *Dubose* as authority for allowing courts to independently assess the reliability of even unplanned encounters. I acknowledge it to be true that the *Dubose* majority opinion did discuss the extensive studies conducted on the issue of identification evidence and did comment how the research supports the conclusion that eyewitness identification is now the greatest source of wrongful convictions in the United States and is responsible for more wrongful convictions than all other causes combined. *See Dubose,* 699 N.W.2d 582, ¶ 30. But it is unwarranted for the majority in this case to make the leap that the *Dubose* court was implementing a new rule allowing trial courts to exercise gatekeeper responsibility with regard to *all* identifications. One need only look at the *Dubose* court's language to determine that this is not the case. The *Dubose* court, in referring to the recent studies, said that "[i]n light of such evidence," it was changing its approach in the area of "suggestive procedures." *See id.,* ¶ 31 (citation omitted). To read *Dubose* to say anything more than that is grave error.

¶ 29. This point brings me to my next complaint about the majority opinion. The majority appears to assert, either as an alternative argument or as a means to buttress its *Dubose* interpretation—I am not sure which—that this case is merely a review of the circuit court's exercise of discretion in deciding not to admit this identification evidence. The majority seemingly claims that, under Wis. Stat. § 901.04, the trial court in this case and, by extension, any circuit court in this state, has the authority to keep evidence out if it deems the evidence to be unreliable. Therefore, even if this is not a police

procedure case, since the circuit court in this case relied on the facts of record and gave a reasoned explanation for why it believed the spontaneous identification to be impermissibly suggestive, the majority feels that we must defer to this judgment and affirm. In my view, this is a serious misunderstanding of the law.

¶ 30.   First, I need to state the obvious. The circuit court kept the evidence out because it thought that the spontaneous encounter was "impermissibly suggestive." As I have already explained, the only time a court considers whether an identification was "impermissibly suggestive" is if the suggestiveness was brought about by state action. That is what *Marshall* holds. A court does not validly exercise discretion based on a misunderstanding of the law and that is what has occurred here. As the court in *Jarrett v. Headley*, 802 F.2d 34, 42 (2d Cir. 1986), stated, if the *procedures* are not impermissibly suggestive, independent reliability is not a constitutionally required condition of admissibility and the reliability of the identification is simply a question for the jury. The circuit court thus had no business deciding this case under the rubric of an "impermissibly suggestive" procedure.

¶ 31.   Second, what the majority fails to understand is that the usual role of the circuit court is to act as only a limited gatekeeper with regard to admissibility issues. Only when due process concerns come into play has our jurisprudence given circuit courts a greater gatekeeping function. As we wrote in *State v. Peters*, 192 Wis. 2d 674, 689, 534 N.W.2d 867 (Ct. App. 1995), the role of trial judges is "oblique." Certainly, evidence must be relevant to be admissible. And just as certainly, someone must have the job of deciding whether the evidence is admissible. This is the job of the circuit court. The circuit court must determine under Wis. Stat. § 904.01 only whether there is "*any* tendency to

make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* (emphasis added). This is an extremely low threshold. If relevant, the circuit court still has the authority to exclude the evidence for other reasons, including, to name a few, statutory considerations such as hearsay, the superfluous nature of the evidence, waste of judicial time and resources, or the court's determination that the evidence is inherently improbable or that its probative value is outweighed by its prejudice to the defendant. *See Peters,* 192 Wis. 2d at 689. Once these considerations have been analyzed by the circuit court, the limited gatekeeper role is finished. As Professor Blinka has stated, "If the evidence has any tendency to prove (or disprove) a consequential proposition, it should be admitted." DANIEL D. BLINKA, WISCONSIN PRACTICE: WISCONSIN EVIDENCE § 401.102 (2d ed. 2001). The weight of such evidence is for the trier of fact. *See id.*

¶ 32.   But there are certain areas of the law where our supreme court has given circuit courts more responsibility. One such area is where identification was made pursuant to a specified police procedure. *State v. Wolverton,* 193 Wis. 2d 234, 533 N.W.2d 167 (1995), *abrogated by Dubose,* 699 N.W.2d 582 (new test applicable to showup procedures), is a case in point. There, our supreme court recognized that certain police identification procedures might be orchestrated or manipulated by the State. *See Wolverton,* 193 Wis. 2d at 264. If such manipulation and orchestration by the State is shown to be present, it may seriously affect the credibility of the identification. To test the state procedure, the court directed circuit courts to exercise the power to assess (1) the witness' opportunity to view the criminal at the time of the offense, (2) the degree of attention the

825

witness paid, (3) the accuracy of prior descriptions, (4) the time elapsed between the crime and the confrontation, and (5) the level of certainty demonstrated at the confrontation. *Id.* at 264–65. In sum, the supreme court expressly authorized greater gatekeeping authority in this area.

¶ 33. It is my view that because *Marshall* does not employ this kind of reliability test in the context of an unplanned encounter, the State need only meet the very low threshold test for reliability that Wis. Stat. § 904.01 requires all types of evidence to meet. Nothing in the circuit court's analysis or the facts convinces me that Stuller's identification of Hibl had *no tendency whatsoever* to support the proposition that Stuller recognized Hibl as the individual who drove the van on the day of the accident. What the circuit court's opinion really does is call into question any identification made in the halls of our courthouses, no matter how spontaneous and free from police or prosecutorial suggestion it may be. I cannot abide by this result and dissent.[2]

---

[2] Even in light of recent data calling into question the veracity of some spontaneous identifications, I see no great problem in continuing to allow the juries to test the credibility of this type of identification rather than leave it to the circuit courts. It bears repeating that "[c]ross-examination has been described as the 'greatest legal engine ever invented for the discovery of truth.' " *State v. Stuart*, 2005 WI 47, ¶ 26 n.7, 279 Wis. 2d 659, 695 N.W.2d 259 (quoting *California v. Green*, 399 U.S. 149 (1970). The solution is to allow defendants greater latitude in bringing this data, and the expert witnesses who can testify to this data, to the attention of the jury. In the past, circuit courts have been reluctant to allow such evidence by defendants. But, should that change, juries would be well equipped to decide the credibility of these identifications.